| | |
|---|---|
| JENNIFER M. PROBST, individually, and as Representatives of a Class of Participants and Beneficiaries of The Lilly Employee 401(k) Plan, | |
| Plaintiff, | Case No. 1:22-cv-01106-JMS-DLP |
| v. | CLASS ACTION AMENDED COMPLAINT FOR CLAIMS UNDER 29 U.S.C. 1132(A)(2) |
| ELI LILLY AND COMPANY | |
| and | |
| BOARD OF DIRECTORS OF ELI LILLY AND COMPANY | |
| and | |
| ELI LILLY AND COMPANY EMPLOYEE BENEFIT COMMITTEE | |
| and | |
| ELI LILLY AND COMPANY FUND ADVISORY COMMITTEE | |
| Defendants | |

## AMENDED COMPLAINT

COMES NOW Plaintiff, Jennifer M. Probst ("Plaintiff"), individually and as representatives of a Class of Participants and Beneficiaries of The Lilly Employee 401(k) Plan (the "Plan" or "Lilly Plan"), by her counsel, WALCHESKE & LUZI, LLC, and

MACEY SWANSON LLP, as and for a claim against Defendants, alleges and asserts to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

### INTRODUCTION

1. Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2. The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3. The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4. Even in a defined contribution plan in which participants are responsible for selecting their plan investments, ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.)

"If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5. Defendants, Eli Lilly and Company ("Lilly"), the Board of Directors of Eli Lilly and Company ("Board"), the Eli Lilly and Company Employee Benefits Committee, and the Eli Lilly and Company Fund Advisory Committee ("Plan Committees") (collectively "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as The Lilly Employee 401(k) Plan (the "Plan" or "Lilly Plan") – that it sponsors and provides to its employees.

6. During the putative Class Period (May 31, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping fees," *Hughes*, 142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Alight Solutions ("Alight").

7. These objectively unreasonable recordkeeping fees cannot be contextually justified, and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8. Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive recordkeeping fees.

9. Defendant Lilly also engaged in self-dealing in violation of ERISA's duty of loyalty, Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and fiduciary prohibited

transaction provisions, Section 406(b)(1), 29 U.S.C. § 1106(b)(1), with regard to providing superfluous "plan administrator" services to the Plan, and paying itself illicitly with plan assets.

10. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan recordkeeping services.

11. ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

12. There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which [she] has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016.)

13. The unreasonable recordkeeping fees paid inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan services were improvident.

14. These breaches of fiduciary duty, and violation of the prohibited transaction provisions, caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

15. To remedy these fiduciary breaches and prohibited transactions, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

<u>JURISDICTION AND VENUE</u>

16.      This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

17.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

18.      Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

19.      In conformity with 29 U.S.C. §1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

<u>PARTIES</u>

20.      Plaintiff, Jennifer M. Probst, is a resident of the State of Wisconsin and currently resides in Oshkosh, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

21.      Plaintiff has been a Senior Sales Representative in the Wisconsin sales territory for Eli Lilly and Company, from June 10, 2011, through the present.

22.      During the Class Period, Plaintiff invested in the Target Date Portfolio 2040 and the Target Date Portfolio 2055.

23.      Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered actual injuries to her Plan account through paying excessive recordkeeping fees during the Class Period, those injuries are fairly traceable to

Defendants' unlawful conduct in maintaining Alight as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

24.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond her own injuries.

25.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive Bundled RKA fees and fiduciary self-dealing) necessary to understand that Defendants breached their fiduciary duties and engaged in prohibited transactions until shortly before this suit was filed.

26.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets"), Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

27.     Eli Lilly and Company ("Lilly") is an American pharmaceutical company headquartered in Indianapolis, Indiana, with offices in 18 countries. Its products are sold in approximately 125 countries, and last year generated over 22 billion dollars in revenue. Lilly is headquartered at Lilly Corporate Center, Indianapolis, Indiana 46285. In this Complaint, "Lilly" refers to the named Defendants and all

parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

28. Lilly acted through its officers, including the Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. Lilly and its Board appointed other Plan fiduciaries on the Plan Committees, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.

29. The Plan documents provide that the Board as a whole appoints the members of the two committees. In particular, Section 12.01 and 12.02(b) provides that the Board as a whole appoints the members of the Employee Benefits Committee, and Section 13.01 provides that the Board as a whole appoints members of the Fund Advisory Committee.

30. For these reasons, Lilly and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

31. The Employee Benefits Committee ("EBC") and the Fund Advisory Committee ("FAC") (collectively "Plan Committee Defendants") are the Plan Administrators. The EBC is primarily responsible for the recordkeeping contract and fees, but the FAC plays a role as well with respect to recordkeeping and plan administration fees.

32. As the Plan Administrators, Plan Committee Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Plan Committee Defendants have authority and responsibility for the

control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

33. The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Lilly's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

34. In 2020, the Plan had about $8,220,707,681 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Alight to ensure that Alight remained the prudent and objectively reasonable choice.

35. With 24,951 participants in 2020, the Plan had more participants than 99.94% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $8,220,707,681 in assets in 2020, the Plan had more assets than 99.98% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

36. Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

37. Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

38. Although Lilly contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or engaged in unlawful self-dealing.

39. While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

40. Employers must consider the fees and expenses paid by a plan. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

41. Employers must: (1) establish a prudent process for selecting service providers; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be appropriate choices.

Recordkeeping (Bundled RKA) Services

42. Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as

"recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans. Alight is one such recordkeeper.

43. These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard, bundled offerings of the same level and quality.

44. There are two types of essential RKA services provided by all record-keepers. For mega plans with substantial bargaining power (like the Lilly Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis.) The Bundled RKA services include the following standard services:

  a. Recordkeeping;

  b. Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

  c. Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

  d. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

  e. Maintenance of an employer stock fund (if needed);

  f. Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g. Plan consulting services including assistance in selecting the investments offered to participants;

h. Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i. Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j. Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

45. The second type of essential RKA services, hereafter referred to as "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).

46. These "Ad Hoc RKA" services typically include:

a. Loan processing;

b. Brokerage services/account maintenance;

c. Distribution services; and

d. Processing of Qualified Domestic Relations Orders (QDROs).

47. "Bundled RKA" includes both "fund administration" and "plan administration" fees, reported in the annual Lilly Plan fee disclosures, and both are paid by Plan participants to Alight on an annual basis in the form of direct and indirect recordkeeping fees.

48. For the Lilly Plan, any minor variations in the level and quality of Bundled RKA services described above had little to no material impact on the fees charged by Alight.

49. All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

50. Most of the fees earned by recordkeepers typically come from the Bundled RKA fees, though it is possible in case where the disparity is higher than usual between what is reported in Bundled RKA fees on Form 5500, and what is reported in administrative service agreements between the Plan Sponsor and the recordkeeper, that Ad Hoc RKA fees are excessive as well.

51. Because dozens of recordkeepers can provide the complete suite of required Bundled RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

52. Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

53. Plan fiduciaries routinely request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan. And they request that the Bundled RKA revenue requirement be expressed as either a flat per participant fee rate or an asset-based fee rate, although the use of

an asset-based fee structure is not a best practice and permits recordkeepers to increase revenue without necessarily providing any additional value in services.

54. While there may be minor differences in the way the Bundled RKA services are delivered, those differences are deemed immaterial to the price comparisons in virtually all cases.

55. Whether the minor differences be in the number of staff utilized for call center support, the frequency of participant communications, or the number of investment education sessions held by the plan sponsor, these differences are immaterial when considering the level and quality of services provided by the plan from a cost perspective.

56. The Lilly Plan had a standard package of Bundled RKA services from Alight, which provided Bundled RKA services of a nearly identical level and quality to other recordkeepers who service mega plans.

57. There is nothing in their Form 5500 filings during the Class Period, nor anything disclosed in the participant section 404(a)(5) fee and service disclosure documents, that suggests that the annual plan administration fees charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans.

58. Accordingly, the disparity between the Plan's Bundled RKA fee, and the fee paid by several other similarly sized plans for the same standard bundle of RKA services, cannot be explained by any additional services, or the quality of those services, provided by Alight to the Plan.

59.     Because recordkeepers offer the same bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants.

60.     Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased, partially because of the success of class fee litigation.

61.     Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

62.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing Bundled RKA has stabilized, and has not materially changed for mega plans, including the Lilly Plan. In other words, reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period.

63.     The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan. As a plan gains more participants, the reasonable market rate for the services provided by the recordkeeper will decline.

64.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

65.     As a result, recordkeepers make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

66.     Recordkeepers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

67.     Regardless of the pricing structure that the plan fiduciary negotiates with a service provider, and Plaintiff expresses no preference, the amount of compensation paid to service providers, like Alight, must be *reasonable* (not the *cheapest* or *average*) given the contextual market during the Class Period.

68.     As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is objectively reasonable by contextually understanding the market for such recordkeeping services at the time they entered into administrative service agreements with the recordkeeper.

## THE PLAN

69.     During the entire Class Period, the Plan received recordkeeping services (Bundled RKA) from Alight.

70. At all relevant times, the Plan's Bundled RKA fees were objectively unreasonable and excessive when compared with other comparable 401(k) and 403(b) plans offered by other sponsors that had similar numbers of plan participants.

71. The Bundled RKA fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally offered to mega plans, like the Lilly Plan, regardless of the number or level of services selected by the Plan.

72. It is clear based on the 5500 forms and 404(a)(5) participant disclosures that Alight did not provide any services at any higher level that were not also part of the standard package of Bundled RKA services provided by all recordkeepers to mega plans.

73. These excessive Plan Bundled RKA fees led to lower net returns than participants in comparable 401(k) and 403(b) plans enjoyed.

74. During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for Bundled RKA services.

75. Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES
## SELECTING & MONITORING ITS RECORDKEEPER

76.     A plan fiduciary is required to fully understand all sources of revenue received by its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the quality and level of services provided.

77.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, through soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

78.     Prudent plan fiduciaries can easily and inexpensively receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees.

79.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

80.     A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

81. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

82. First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

83. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

84. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

85. Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of Bundled RKA services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR BUNDLED RKA FEES AND THE PLAN THUS PAID UNREASONABLE BUNDLED RKA FEES

86. A plan fiduciary must continuously monitor its Bundled RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

87. During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RKA fees, including but not limited to Alight.

88. During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Alight, in order to avoid paying unreasonable Bundled RKA fees.

89. During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable Bundled RKA fees it paid to Alight, and in light of the level and quality of recordkeeper services it received.

90. From the years 2016 through 2020, the table below shows the actual year-end participants annual recordkeeping plus other plan administration Bundled RKA fees, illustrating that the Plan had on average 25,817 participants with account balances and paid an average effective annual Bundled RKA fee of at least approximately $1,989,925, which equates to an average of approximately $77 per participant. These are the minimum amounts that could be paid:

## Bundled Recordkeeping and Administration (RKA) Fees

|  | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|
| Participants | 27,043 | 25,393 | 26,891 | 24,805 | 24,951 | 25,817 |
| Est. RKA Fees | $1,682,018 | $1,862,460 | $1,889,546 | $2,204,127 | $2,308,324 | $1,989,295 |
| Est. RKA Per Participant | $62 | $73 | $70 | $89 | $93 | $77 |

91. Even assuming the "fund administration fee and the Plan administration fee" rates disclosed in the 2021 Plan participant fee disclosures were constant throughout the Class Period (which they were not), Plan participants paid the following amounts for Bundled RKA services:

### Breakdown of Bundled RKA Fees Based on Lilly Plan Fee Disclosures

| Investment | Assets from Form 5500 | | | | | Breakdown of Total Annual Operating Expenses | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 2016 | 2017 | 2018 | 2019 | 2020 | Total Annual Operating Expenses | Fund Administration | Plan Administration | Investment Management |
| Target Date Funds | $2,104,797,980 | $2,227,634,467 | $2,161,507,489 | $2,666,182,180 | $2,681,494,123 | 0.21% | 0.01% | 0.02% | 0.18% |
| Eli Lilly Common Stock | $684,118,926 | $688,803,902 | $809,886,093 | $812,376,607 | $968,264,814 | 0.02% | 0.00% | 0.02% | 0.00% |
| US All Cap Equity Active | $532,750,212 | $580,237,008 | $472,641,966 | $507,871,095 | $514,439,695 | 0.36% | 0.05% | 0.02% | 0.29% |
| US All Cap Equity Index | $1,035,454,758 | $1,283,684,790 | $1,182,856,302 | $1,525,069,614 | $1,699,555,194 | 0.03% | 0.00% | 0.02% | 0.01% |
| International Equity - Active |  |  | $149,892,729 | $173,119,550 | $176,238,843 | 0.52% | 0.08% | 0.02% | 0.42% |
| International Equity - Index | $311,096,341 | $476,703,625 | $399,272,352 | $514,199,495 | $545,102,372 | 0.09% | 0.02% | 0.02% | 0.05% |
| Real Assets | $37,307,832 | $41,790,388 | $39,591,644 | $54,197,263 | $54,641,726 | 0.15% | 0.01% | 0.02% | 0.12% |
| Fixed Income - Active | $4,735,848 | $5,607,201 | $3,339,410 | $9,143,086 | $9,805,575 | 0.31% | 0.01% | 0.02% | 0.28% |
| Stable Income Fund - Active | $983,436,849 | $943,023,957 | $946,072,310 | $917,357,460 | $982,950,906 | 0.28% | 0.00% | 0.02% | 0.26% |

### Administration Fees

|  | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Fund Administration | $543,279 | $612,962 | $656,533 | $768,223 | $781,826 |
| Plan Administration | $1,138,740 | $1,249,497 | $1,233,012 | $1,435,903 | $1,526,499 |
| Total Administration | $1,682,018 | $1,862,460 | $1,889,546 | $2,204,127 | $2,308,324 |
|  |  |  |  |  |  |
| Fund Administration ($/pp) | $20 | $24 | $24 | $31 | $31 |
| Plan Administration ($/pp) | $42 | $49 | $46 | $58 | $61 |
| Total Administration ($/pp) | $62 | $73 | $70 | $89 | $93 |

92. These disclosed amounts greatly exceed the amounts Alight claimed it was charging for "recordkeeping" services. Either Defendants allowed the Plan participants to pay fees to Alight that were in excess of the agreed amounts, which would

be imprudent, or the service contract provided additional revenue to Alight for other aspects of the Bundled RKA services in the form of fund administration or plan administration fees.

93. From the years 2016 through 2020, and based the Plan information described above, the table below illustrates the annual Bundled RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual Bundled RKA fees paid by the Plan (as identified in the table above).

**Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500[1]**
(Price Calculations are based on 2018 Form 5500 information or most recent if not available)

| Plan | Participants | Assets | RKA Fee | RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| Michelin Retirement Account Plan | 13,798 | $616,026,001 | $425,270 | $31 | Vanguard | White |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $635,857 | $39 | Voya | White |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard | White |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |

---

[1] This chart represents a very conservative approach using the Bundled RKA fee rate for the Lilly Plan while comparing it to the total RKA fee rate (Bundled and Ad Hoc fees) for the comparator plans. This approach understates the actual difference in RKA fees between the Lilly Plan and the comparator plans because the Lilly Plan would have a higher annual total RKA fees average over the Class Period if Ad Hoc fees were also considered.

| | | | | | | |
|---|---|---|---|---|---|---|
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $486,029 | $26 | Great-West | White |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $481,539 | $25 | Great-West | White |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price | White |
| **The Lilly Plan Average Fee** | **25,817** | **$6,583,650,795** | **$1,989,295** | **$77** | **Alight** | **Red** |
| Kindred 401 (K) Plan | 34,092 | $1,299,328,331 | $1,121,564 | $33 | T. Rowe Price | White |
| The Savings and Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard | White |
| Deseret 401(K) Plan | 34,357 | $3,381,868,127 | $1,117,252 | $33 | Great-West | White |
| Danaher Corporation & Subsidiaries Savings Plan | 35,757 | $4,565,702,706 | $988,267 | $28 | Fidelity | White |

94. From the years 2016 through 2020, and based the Plan information described above, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual Bundled RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual Bundled RKA fees paid by the Plan (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



95. From the years 2016 to 2020, and based the Plan information described above, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that the Plan paid an effective average annual Bundled RKA fee of at least $77 per participant for RKA.

96. The more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Bundled RKA services (which includes recordkeeping fees, revenue sharing, and other plan administration fees).

97. When a plan fiduciary follows prudent practices as outlined by the Department of Labor ("DOL"), and solicits bids from several recordkeepers in a competitive environment, some initial bids for the Bundled RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate a Bundled RKA fee lower than the trend line such that the total RKA fee would be proximate to the trend line.

98. From the years 2016 through 2020, and based the Plan information described above, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual Bundled RKA fee of around $30 per participant, if not lower.

99. From the years 2016 through 2020, and based the Plan information described above, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $1,989,295 per year in Bundled RKA fees, which equated to an effective average of approximately $77 per participant per year.

100. From the years 2016 through 2020, and based the Plan information described above, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar

amounts of money under management, receiving a similar level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate of approximately $774,498 per year in Bundled RKA fees, which equates to approximately $30 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *two and half more than* what they could otherwise pay for Bundled RKA.

101. From the years 2016 through 2020, and based the Plan information described above, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its participants on average approximately $1,214,797 per year in Bundled RKA fees, which equates to on average approximately $47 per participant per year.

102. From the years 2016 to 2020, and because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $6,073,984 in unreasonable and excessive Bundled RKA fees.

103. From the years 2016 to 2020, and based the Plan information described above, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan

actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $8,190,915 in Bundled RKA fees.

104. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for mega plans are providing the exact same level and quality of services.

105. Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Alight, and Defendants could have obtained the same Bundled RKA services for less from other, similar recordkeepers.

106. Plaintiff paid these excessive Bundled RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to her Plan account as a result.

107. Plaintiff has participated in several 401(k) plans from other employers and there have been no material differences in the services that she has received.

108. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Alight vis-à-vis the fees that other RKA providers would charge, and would have accepted, for the same level and quality of services.

109. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Bundled RKA fees it paid to Alight, but Defendants either simply failed to do so, or did so ineffectively, given that it paid *two and half times* the Bundled RKA fees than it should have.

110. During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Alight, it would have realized that the Plan was compensating Alight unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants, and therefore should have removed Alight as Plan recordkeeper.

111. The Plan recordkeeping fees were also excessive relative to the recordkeeping services received, since the quality and level of such services are standard for mega 401(k) and 403(b) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in recordkeeping fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

112. The market for Bundled RKA services for mega plans, like the Lilly Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for Bundled RKA services and what he reasonable fair market fee was for identical services.

113. More specifically, Defendants disclosed to Plan participants through the Plan 404(a) fee disclosures that Plan participants would pay Bundled RKA through the "Total Annual Operating Expense" of the investment options and that therefore the Plan participants would not see those fees directly.

114. These same Plan fee disclosures point out that the Total Annual Operating Expense covers not only investment management (portfolio management) fees, but also "recordkeeping and participant service fees, trustee fees, . . . and other expenses related to the maintenance of the Plan or its funds."

115. These services are standard RKA services. The Plan fee disclosure goes on to define "recordkeeping and participant services fees [as] Cost for activities like keeping data on participants and participant accounts, communication materials, internet services, and assisting participants with transactions." This describes all the standard bundled RKA services provided by all national recordkeepers to all large defined contribution plans.

116. The Plan fee disclosures also note that the "Total Annual Operating Expenses [are] Fees that are charged as a percent of holdings in an investment to cover investment management fees plus any administrative fees such as recordkeeping, trustee, etc."

117. Finally, the Plan fee disclosures discloses that the total annual operating expense of the investment options includes "an estimated fund administration fee from the investment manager . . . and an estimated Plan administration fee."

118.     During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RKA fees than they should have been and/or by failing to take effective remedial actions including removing Alight as the Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants, causing tens of millions of dollars of harm to Plaintiff and Class Member's retirement accounts.

<u>SELF DEALING</u>

119.     Lilly is a fiduciary to the Plan because it exercises discretionary authority, responsibility, and control over the management and administration of the Plan and exercises authority and control over Plan assets.

120.     Based on publicly available DOL 5500 Forms, Lilly paid itself for providing "plan administration" services (Service Code 14) to the Plan. Specifically, based on information provided by Lilly in its 5500 filings, the following amounts were paid out of plan assets to itself from 2016 through 2020:

### Eli Lilly and Company - Schedule C - Direct Compensation

| Provider | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|
| ELI LILLY AND COMPANY | $320,163 | $333,045 | $241,633 | $317,260 | $270,870 | $1,482,971 |
| Compounding Percentage (VIIIX) | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% | |
| Estimated Cumulative Damages | $320,163 | $723,068 | $932,813 | $1,543,723 | $2,098,792 | |

121.     The "plan administration" services purportedly provided to the Plan by Lilly did not provide any value to the Plan and did not warrant the payment of the fees to itself.

122. The "plan administration" services purportedly provided to the Plan by Lilly are standard "plan administration" services that were provided already by the Plan's recordkeeper, Alight.

123. Lilly's payment of these fees to itself out of plan assets represents self-dealing and a clear conflict of interest with the Plan and Plan participants and violates the duty of loyalty it owes to Plan participants under ERISA Section 404(a)(1)(A); 29 U.S.C. § 1104(a)(1)(A).

124. The payments to itself of these RKA fees constitute a fiduciary prohibited transaction by Lilly as a fiduciary to the Plan. ERISA Section 406(b), 29 U.S.C. §1106(b)(1).

125. Lilly is obligated to disgorge to the Plan all amounts it received and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. ERISA Section 409(a), 29 U.S.C. §1109(a).

<u>CLASS ACTION ALLEGATIONS</u>

126. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

127. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following Class:

All participants and beneficiaries of The Lilly Employee 401(k) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 31, 2016, and running through the date of judgment.

128. The Class includes approximately 25,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

129. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b. Whether Defendants breached their fiduciary duties to the Plan;

c. What are the losses to the Plan resulting from each breach of fiduciary duty; and

d. Whether Defendants engaged in a fiduciary prohibited transaction when it engaged in self-dealing; and

e. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty and engaging in prohibited transactions.

130. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

131. Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because she is a participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

132. Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

133. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

134. Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

135. The claims brought by the Plaintiff arises from fiduciary breaches and prohibited transactions as to the Plan in its entirety and does not involve mismanagement of individual accounts.

136. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

137. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

138. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

<u>FIRST CLAIM FOR RELIEF</u>
Breach of Duty of Prudence of ERISA, as Amended
<u>(Plaintiff, on behalf of herself and Class, Against Plan Committee Defendants – Bundled RKA Fees)</u>

139. Plaintiff restates the above allegations as if fully set forth herein.

140. Plan Committee Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

141. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Plan Committee Defendants in their administration of the Plan.

142. Plan Committee Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable Bundled RKA fees.

143. During the Class Period, Plan Committee Defendants had a fiduciary duty to do all of the following: ensure that the Plan's Bundled RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

144. During the Class Period, Plan Committee Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's Bundled RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

145. During the Class Period, Plan Committee Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the Bundled RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable levels.

146.     During the Class Period, Plan Committee Defendants breached their duty to Plan participants, including to Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

147.     Plan Committee Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

148.     As a result of Plan Committee Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of millions of dollars in objectively unreasonable and unnecessary monetary losses.

149.     Plan Committee Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Lilly Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against Defendants Lilly**
**and Board – Bundled RKA Fees)**

150.     Plaintiff restates the above allegations as if fully set forth herein.

151. Defendant Lilly and Board had the authority to appoint and remove members or individuals responsible for Plan Bundled RKA fees on the Eli Lilly and Company Employee Benefit Committee and Funds Advisory Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

152. In light of this authority, Defendant Lilly and Board had a duty to monitor those individuals responsible for Plan Bundled RKA fees on the Plan Committees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

153. Defendant Lilly and Board had a duty to ensure that the individuals responsible for Plan Bundled RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's Bundled RKA fees; and reported regularly to Defendant Lilly and Board.

154. The objectively unreasonable and excessive Bundled RKA fees paid by the Plan inferentially establish that Defendant Lilly and Board breached their duty to monitor by, among other things:

    a.    Failing to monitor and evaluate the performance of individuals responsible for Plan Bundled RKA fees on the Plan Committees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably Bundled RKA expenses;

b.   Failing to monitor the process by which the Plan's recordkeeper, Alight, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.   Failing to remove individuals responsible for Plan Bundled RKA fees on the Plan Committees whose performance was inadequate in that these individuals continued to pay the same Bundled RKA costs even though solicitation of competitive bids would have shown that maintaining Alight as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiff's and other Plan participants' retirement savings.

155.   As the consequences of the breaches of the duty to monitor for Bundled RKA fees the Plaintiff and Plan participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

156.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendant Lilly and Board are liable to restore to the Lilly Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Bundled RKA fees on the Plan Committees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

<u>THIRD CLAIM FOR RELIEF</u>
Fiduciary Prohibited Transactions under ERISA, as Amended,
And Breach of Duty of Loyalty of ERISA, as Amended
<u>(Plaintiff, on behalf of herself and Class, Against Defendant Lilly)</u>

157.   Under ERISA Section 404(a)(1)(A), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

158. Under ERISA Section 406(b)(1), "[a] fiduciary with respect to a plan shall not— (1) deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

159. Defendant Lilly, as fiduciary to the Plan, did not discharge its duties with respect to the Plan solely in the interest of Plan participant benefits and for the exclusive purpose of providing benefits to participants and their beneficiaries, instead engaging in self-dealing and unlawfully paying itself from plan assets, for "plan administrator" services that were already being provided by Alight.

160. The Bundled RKA fee charged by Alight is thereby even more unreasonable because Lilly was providing services that would typically be provided as part of the recordkeeper's service offerings. The reasonable Bundled RKA fee should have been reduced by the dollar amounts paid to Lilly since Lilly was purportedly providing some of these "plan administrator" services typically provided by the Plan's recordkeeper.

161. Defendant Lilly dealt with the assets of the Plan in its own interest and for its own account by diverting plan assets to itself instead of using the plan assets for the exclusive benefit of Plan participants. ERISA Section 406(b)(1); 29 U.S.C. §1106(b)(1), thereby breaching its duty of loyalty to the Plan.

162. The payments to itself for purported "plan administrator" service purposes constitute a fiduciary prohibited transaction by Lilly as a fiduciary to the Plan because Lilly dealt with the assets of the plan for its own interest and for its own account.

163.     Lilly is obligated to disgorge to the Plan all amounts it received and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. 29 U.S.C. §1109(a); *Barboza v. California Assn. of Prof. Firefighters*, 799 F.3d 1257, 1269 (9th Cir. 2015); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 750 (6th Cir. 2014).

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.     A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable Bundled RKA fees and for engaging in self-dealing, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An Order requiring Lilly to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Lilly as necessary to effectuate relief, and to prevent Lilly's unjust enrichment;

F.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    Such other and further relief as the Court deems equitable and just.

Dated this 22nd day of August, 2022

*s/ Paul M. Secunda*_____
Paul M. Secunda, WI Bar No. 1074127
**WALCHESKE & LUZI, LLC**
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
Facsimile: (262) 565-6469
E-Mail: psecunda@walcheskeluzi.com

Jeffrey A. Macey, IN Bar No. 28378-49
**MACEY SWANSON LLP**
429 N. Pennsylvania Street, Suite 204
Indianapolis, IN   46204
Telephone: (317) 637-2345
Facsimile: (317) 637-2369
Email: jmacey@MaceyLaw.com

*Attorneys for Plaintiff and Proposed Class*