UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JENNIFER M. PROBST, *Individually, and as Representative of a Class of Participants and Beneficiaries of The Lilly Employee 401(k) Plan*, | ) ) ) ) |
| | ) |
| *Plaintiff*, | ) |
| | ) |
| vs. | ) |
| | ) |
| ELI LILLY AND COMPANY, BOARD OF DIRECTORS OF ELI LILLY AND COMPANY, ELI LILLY AND COMPANY EMPLOYEE BENEFIT COMMITTEE, and ELI LILLY AND COMPANY FUND ADVISORY COMMITTEE, | ) ) ) ) ) |
| | ) |
| *Defendants*. | ) |

No. 1:22-cv-01106-JMS-MKK

## **ORDER**

Plaintiff Jennifer Probst, individually and on behalf of a putative class of participants and beneficiaries of the Lilly Employee 401(k) Plan (the "Plan"), initiated this litigation on May 31, 2022 against Defendants Eli Lilly and Company ("Eli Lilly"), the Board of Directors of Eli Lilly and Company (the "Board"), the Eli Lilly and Company Employee Benefit Committee (the "EBC"), and the Eli Lilly and Company Fund Advisory Committee (the "FAC") (collectively, "Lilly"),[1] alleging that Lilly has violated various provisions of the Employee Retirement Income

---

[1] Ms. Probst also named various individuals as Defendants, but subsequently voluntarily dismissed them and they are no longer parties to the litigation. [Filing No. 24.]

Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").  [Filing No. 1.]  Lilly has filed a Motion to

Dismiss, [Filing No. 31], which is now ripe for the Court's decision.[2]

# I.
## STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a claim that does not state a right to

relief.  The Federal Rules of Civil Procedure require that a complaint provide the defendant with

"fair notice of what the . . . claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551

U.S. 89, 93 (2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).  In reviewing

the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all

permissible inferences in favor of the plaintiff.  *See Active Disposal Inc. v. City of Darien*, 635

F.3d 883, 886 (7th Cir. 2011).  A Rule 12(b)(6) motion to dismiss asks whether the complaint

"contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on

its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  The

Court will not accept legal conclusions or conclusory allegations as sufficient to state a claim for

relief.  *See McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011).  Factual allegations

must plausibly state an entitlement to relief "to a degree that rises above the speculative level."

*Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012).  This plausibility determination is "a context-

specific task that requires the reviewing court to draw on its judicial experience and common

sense."  *Id.*

In the context of a putative class action under ERISA – like this case – the Seventh Circuit

Court of Appeals has explained the standard for ruling on a 12(b)(6) motion to dismiss as follows:

---

[2] Additionally, the parties have filed a Joint Motion for Oral Argument.  [Filing No. 38.]  Because
the parties' briefs afforded the Court an adequate basis on which to rule on the Motion to Dismiss
without the assistance of oral argument, the Court **DENIES** the parties' Joint Motion for Oral
Argument.  [Filing No. 38.]

In putative ERISA class actions, Rule 12(b)(6) motions are an important mechanism for weeding out meritless claims. Courts apply a careful, context-sensitive scrutiny of a complaint's allegations to divide the plausible sheep from the meritless goats. Because the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.

*Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (quotations and citations omitted).

## II.
### BACKGROUND

Ms. Probst makes the following allegations in the Amended Complaint – the operative complaint in this case – only some of which the Court must accept as true at this time:[3]

### A.    Defined Contribution Plans Generally

A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. [Filing No. 26 at 8.] An employer may also make matching contributions based on an employee's elective deferrals. [Filing No. 26 at 8.] Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. [Filing No. 26 at 8.]

Contributions to a plan account and the earnings on investments increase retirement income, but fees and expenses paid by the plan can substantially reduce retirement income. [Filing

---

[3] While the Court is cognizant of its general duty to accept Ms. Probst's allegations as true when considering Lilly's Motion to Dismiss, it is not required to accept legal conclusions or allegations that are conclusory or implausible. *See Munson*, 673 F.3d at 632-33 ("We accept well-pleaded facts as true but not legal conclusions or conclusory allegations that merely recite a claim's elements. We must determine whether the factual allegations plausibly suggest an entitlement to relief.") (quotations and citations omitted); *McCauley*, 671 F.3d at 617 ("Many of the alleged 'facts' are actually legal conclusions or elements of the cause of action, which may be disregarded on a motion to dismiss."). As discussed below, and as Lilly argues, many of Ms. Probst's allegations fall into one or more of those categories and so cannot be relied upon by Ms. Probst to support her claims.

No. 26 at 9.]  Fees and expenses are significant factors that affect plan participants' investment

returns and impact their retirement income.  [Filing No. 26 at 9.]

   **B.     The Plan**

        Since May 31, 2016, Lilly has maintained the Plan, which is a 401(k) defined contribution

plan.  [Filing No. 26 at 3.]  Lilly acted through its officers, including the Board, to perform Plan-

related functions and appointed other Plan fiduciaries on various committees.  [Filing No. 26 at 7.]

The  EBC  and  the  FAC  (collectively,  the  "Plan Committee Defendants")  are  the  Plan

Administrators.  [Filing No. 26 at 7.]  The Plan Committee Defendants handle the day-to-day

operation  of  the  Plan,  with  authority  and  responsibility  for  the  control,  management,  and

administration  of  the  Plan.  [Filing No. 26 at 7-8.]  The  Plan  is  a  "401(k)  defined  contribution

pension plan…, meaning that Lilly's contributions to the payment of Plan costs is guaranteed but

the pension benefits are not."  [Filing No. 26 at 8 (quotation and citation omitted).]

        In 2020, the Plan had about $8,220,707,681 in assets entrusted to the care of the Plan's

fiduciaries and had "substantial bargaining power regarding Plan fees and expenses."  [Filing No.

26 at 8.]  Also in 2020, the Plan had 24,951 participants which was more than 99.94% of the

defined contribution plans in the United States that filed Form 5500s[4] for the 2020 Plan year.

[Filing No. 26 at 8.]  With $8,220,707,681 in assets in 2020, the Plan had more assets than 99.98%

of the defined contribution plans in the United States that filed Form 5500s for the 2020 Plan year.

[Filing No. 26 at 8.]

---

[4] A Form 5500 is an Internal Revenue Service ("IRS") form that an employer maintaining an
ERISA plan must file "to report information on the qualification of the plan, its financial condition,
investments and the operations of the plan."  http://irs.gov/retirement-plans/form-5500-corner (last
visited Feb. 3, 2023).

### C.      Recordkeeping and Related Administrative Services for ERISA Plans

Defined contribution plan fiduciaries of mega 401(k) plans – meaning plans with over $500

million in assets – hire service providers to deliver a retirement plan benefit to their employees.

[Filing No. 26 at 6; Filing No. 26 at 9.]   A group of national retirement plan service providers

called "recordkeepers" has developed bundled service offerings that can meet all the needs of mega

retirement plans.   [Filing No. 26 at 9-10.]   These recordkeepers deliver all of the essential

recordkeeping and related administrative ("RKA") services through standard, bundled offerings of

the same level and quality.  [Filing No. 26 at 10.]

There are two types of essential RKA services provided by all recordkeepers – "Bundled

RKA" and "Ad Hoc RKA."  [Filing No. 26 at 10-11.]  Bundled RKA services, used by mega plans

like the Plan, are provided as part of a bundled fee for a buffet-style level of services including:

- Recordkeeping;

- Transaction processing (including the technology to process purchases and sales of participants' assets and provide participants with access to investment options selected by the plan sponsor);

- Administrative services related to converting a plan from one recordkeeper to another recordkeeper;

- Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of communications to participants);

- Maintenance of an employer stock fund, if needed;

- Plan document services (including updates to standard plan documents to ensure compliance with new regulatory and legal requirements);

- Plan consulting services (including assistance in selecting the investments offered to participants);

- Accounting and audit services (including the preparation of annual reports);

- Compliance support (including assistance interpreting plan provisions and ensuring that the plan complies with legal requirements); and

- Compliance testing to ensure the plan complies with IRS non-discrimination rules.

[Filing No. 26 at 10-11.]

Bundled RKA services include both "fund administration" and "plan administration" fees and both are paid by plan participants on an annual basis in the form of direct and indirect recordkeeping fees. [Filing No. 26 at 11.] All recordkeepers quote fees for Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of RKA services. [Filing No. 26 at 12.] Most of the fees earned by recordkeepers come from Bundled RKA fees. [Filing No. 26 at 12.] Because dozens of recordkeepers can provide the complete suite of required Bundled RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons. [Filing No. 26 at 12.] Plan fiduciaries routinely request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan and request that the Bundled RKA revenue requirement be expressed as either a flat per participant fee rate or an asset-based fee rate, although the use of an asset-based fee structure is not a best practice and permits recordkeepers to increase revenue without necessarily providing any additional value in services. [Filing No. 26 at 12-13.]

Ad Hoc RKA services often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants, and typically include:

- Loan processing;

- Brokerage services/account maintenance;

- Distribution services; and

- Processing of Qualified Domestic Relations Orders.

[Filing No. 26 at 11.]

Because recordkeepers offer the same bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizeable number of participants. [Filing No. 26 at 14.] Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased, partially because of the success of class fee litigation. [Filing No. 26 at 14.] Recordkeepers are willing, or competitively required, to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures. [Filing No. 26 at 14.] The level of fees that recordkeepers have been willing to accept for providing Bundled RKA services has stabilized and has not materially changed for mega plans, and the reasonable recordkeeping fees paid by the Plan in 2018 are representative of the reasonable fees during the entire time period from May 31, 2016 to the present. [Filing No. 26 at 14.]

The underlying cost to a recordkeeper of providing recordkeeping services to a defined contribution plan is primarily dependent on the number of participant accounts in the plan, rather than on the amount of assets in the plan. [Filing No. 26 at 14.] As a plan gains more participants, the reasonable market rate for the services provided by the recordkeeper will decline. [Filing No. 26 at 14.] The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping services performed by the recordkeepers

on behalf of the investment manager. [Filing No. 26 at 15.] As a result, recordkeepers may make separate contractual arrangements with mutual fund providers – for example, recordkeepers may collect a portion of the total expense ratio fee of the mutual fund (called "revenue sharing" or "indirect compensation") in exchange for providing services that would otherwise have to be provided by the mutual fund. [Filing No. 26 at 15.] Recordkeepers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both. [Filing No. 26 at 15.] Regardless of the pricing structure, the amount of compensation must be reasonable and plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the amount is reasonable. [Filing No. 26 at 15.]

Prudent plan fiduciaries engage in an "independent evaluation" to ensure that they are paying only reasonable fees for recordkeeping. [Filing No. 26 at 17.] This entails soliciting competitive bids from other recordkeepers on a regular basis to perform the same level and quality of services currently being provided to the plan. [Filing No. 26 at 17.] Once they receive bids, plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same or a better level and quality of services for a more competitive reasonable fee if necessary. [Filing No. 26 at 17.] Prudent fiduciaries also implement three processes to manage and control a plan's recordkeeping costs: (1) tracking the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation (*e.g.*, fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports); (2) identifying all fees including direct compensation and revenue sharing being paid to the plan's recordkeeper;

and (3) remaining informed about overall trends in the marketplace regarding the fees being paid by other plans and the recordkeeping rates that are available.  [Filing No. 26 at 18.]

    **D.**    **Lilly's Recordkeeper for the Plan**

Lilly used a recordkeeper called Alight Solutions ("Alight") to provide Bundled RKA services.  [Filing No. 26 at 13.]  The Bundled RKA services Alight provided were part of a standard package of services that were nearly identical in level and quality to services provided by other recordkeepers to other mega plans.  [Filing No. 26 at 13.]  Nothing in Lilly's Form 5500 filings or other Plan documents suggests that the annual plan administration fees charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans.  [Filing No. 26 at 13.]  The disparity between the Plan's Bundled RKA fee and the fee paid by other similarly sized plans for the same standard bundle of RKA services cannot be explained by any additional services, or the quality of those services, provided by Alight to the Plan.  [Filing No. 26 at 13.]

The Plan's 404(a) fee disclosures (the "Fee Disclosures") provided as follows:

- That Plan participants would pay for Bundled RKA services through the "Total Annual Operating Expense" of the investment options, and so the Plan participants would not see those fees directly;

- That the Total Annual Operating Expense covers not only investment management (portfolio management) fees, but also "recordkeeping and participant service fees, trustee fees,…and other expenses related to the maintenance of the Plan or its funds";

- That "recordkeeping and participant services fees" include "[c]ost for activities like keeping data on participants and participant accounts, communication materials, internet services, and assisting participants with transactions," which describes all of the standard bundled RKA services provided by all national recordkeepers to all large defined contribution plans;

- That the "Total Annual Operating Expenses" are "[f]ees that are charged as a percent of holdings in an investment to cover investment management fees plus any administrative fees such as recordkeeping, trustee, etc."; and

- That the Total Annual Operating Expense of the investment options includes "an estimated fund administration fee from the investment manager…and an estimated Plan administration fee."

[Filing No. 26 at 28.]

The Plans' Bundled RKA fees were objectively unreasonable and excessive when compared with other 401(k) and 403(b) plans offered by other sponsors that had similar numbers of plan participants.  [Filing No. 26 at 16.]  The Bundled RKA fees were also excessive relative to the level and quality of recordkeeping services received, and led to lower net returns than participants in comparable 401(k) and 403(b) plans enjoyed.  [Filing No. 26 at 16.]  From May 2016 to the present, Lilly has failed to regularly monitor the Plan's Bundled RKA fees, including but not limited to those paid to Alight.  [Filing No. 26 at 19.]  Lilly failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Alight, in order to avoid paying unreasonable Bundled RKA fees.  [Filing No. 26 at 19.]

From 2016 through 2020, the Plan had an average of 25,817 participants with account balances and paid an average effective annual Bundled RKA fee of approximately $77 per participant ($62 per participant in 2016, $73 per participant in 2017, $70 per participant in 2018, $89 per participant in 2019, and $93 per participant in 2020).  [Filing No. 26 at 19-20.]  These amounts greatly exceed the amounts Alight claimed it was charging for recordkeeping services, so either Lilly allowed Plan participants to pay fees that were in excess of the agreed amounts or the service contract with Alight provided additional revenue to Alight for other aspects of Bundled RKA services.  [Filing No. 26 at 20-21.]

From 2016 through 2020, the annual Bundled RKA fees paid by other comparable plans of similar sizes, with similar amounts of money under management, and receiving a similar level and quality of services were as follows:

| Plan | Participants | Assets | RKA Fee | RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| Michelin Retirement Account Plan | 13,798 | $616,026,001 | $425,270 | $31 | Vanguard | White |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $635,857 | $39 | Voya | White |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard | White |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $486,029 | $26 | Great-West | White |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $481,539 | $25 | Great-West | White |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price | White |
| **The Lilly Plan Average Fee** | **25,817** | **$6,583,650,795** | **$1,989,295** | **$77** | **Alight** | **Red** |
| Kindred 401 (K) Plan | 34,092 | $1,299,328,331 | $1,121,564 | $33 | T. Rowe Price | White |
| The Savings and Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard | White |
| Deseret 401(K) Plan | 34,357 | $3,381,868,127 | $1,117,252 | $33 | Great-West | White |
| Danaher Corporation & Subsidiaries Savings Plan | 35,757 | $4,565,702,706 | $988,267 | $28 | Fidelity | White |

[Filing No. 26 at 21-22] (the "Comparator Table").]

From 2016 to 2020, the Plan paid an effective average annual Bundled RKA fee of at least $77 per participant for RKA services (or a total of approximately $1,989,295 per year), but a hypothetical prudent plan fiduciary would have paid on average an effective annual Bundled RKA

fee of around $30 per participant (or a total of approximately $774,498 per year), if not lower, based on the Comparator Table. [Filing No. 26 at 23-24.] Additionally, from 2016 to 2020, the Plan cost its participants on average approximately $1,214,797 per year in Bundled RKA fees, or approximately $47 per participant per year. [Filing No. 26 at 25.] During that time period, the Plan cost its participants a total minimum amount of approximately $6,073,984 in unreasonable and excessive Bundled RKA fees. [Filing No. 26 at 25.] When accounting for compounding percentages, the Plan cost its participants a total, cumulative amount in excess of $8,190,915 in Bundled RKA fees. [Filing No. 26 at 25-26.] Lilly failed to take advantage of the Plan's size to timely negotiate lower fees from Alight and could have obtained the same Bundled RKA fees for less from other, similar recordkeepers. [Filing No. 26 at 26.] Any minor variation in the level and quality of Bundled RKA services from those typically provided had little to no material impact on the fees charged by Alight. [Filing No. 26 at 12.][5]

Lilly did not regularly monitor Alight to ensure that Alight "remained the prudent and objectively reasonable choice." [Filing No. 26 at 8.] Had Lilly engaged in regular and/or reasonable examination and competitive comparison of the Bundled RKA fees it paid to Alight, it would have determined that the Plan was compensating Alight unreasonably and inappropriately for its size and scale and passing excessive fees to Plan participants. [Filing No. 26 at 27.]

E.    **Lilly's Self-Dealing**

Lilly is a fiduciary to the Plan and paid itself for providing "plan administration" services to the Plan. [Filing No. 26 at 29.] Specifically, from 2016 through 2020 Lilly paid itself the following amounts:

---

[5] Ms. Probst does not set forth any allegations regarding the specific Bundled RKA services any of the comparator plans listed in the Comparator Table received.

### Eli Lilly and Company - Schedule C - Direct Compensation

| Provider | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
|---|---|---|---|---|---|---|
| ELI LILLY AND COMPANY | $320,163 | $333,045 | $241,633 | $317,260 | $270,870 | $1,482,971 |
| Compounding Percentage (VIIIX) | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% | |
| Estimated Cumulative Damages | $320,163 | $723,068 | $932,813 | $1,543,723 | $2,098,792 | |

[Filing No. 26 at 29.]  The "plan administration" services provided to the Plan by Lilly did not provide any value to the Plan and did not warrant the payment of fees to itself.  [Filing No. 26 at 29.]  Instead, the "plan administration" services Lilly purportedly provided to the Plan are standard services that were already being provided by Alight.  [Filing No. 26 at 30.]

**F.     Ms. Probst's Participation in the Plan**

Ms. Probst has been a Senior Sales Representative for Eli Lilly in the Wisconsin sales territory since June 10, 2011.  [Filing No. 26 at 5.]  She has been a participant in the Plan since May 31, 2016.  [Filing No. 26 at 5.]  During her participation in the Plan, she invested in two portfolios – the Target Date Portfolio 2040 and the Target Date Portfolio 2055.  [Filing No. 26 at 5.]  Ms. Probst has participated in several 401(k) plans from other employers and there have been no material differences in the services that she has received.  [Filing No. 26 at 26.]

**G.     The Lawsuit**

Ms. Probst asserts claims on behalf of herself and the following proposed class:

> All participants and beneficiaries of [the Plan] (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 31, 2016, and running through the date of judgment.

[Filing No. 26 at 31.]  She sets forth claims under ERISA for: (1) breach of the duty of prudence related to the Bundled RKA fees against the Plan Committee Defendants; (2) failure to adequately monitor other fiduciaries related to the Bundled RKA fees against Eli Lilly and the Board; and (3)

engaging in fiduciary prohibited transactions and breach of the duty of loyalty against Eli Lilly.

[Filing No. 26 at 33-39.]  Lilly has moved to dismiss all of Ms. Probst's claims.

### III.
### DISCUSSION

**A.     Framework**

The Seventh Circuit Court of Appeals recently provided a helpful summary of a plan fiduciary's duties under ERISA and the role of recordkeepers:

> [ERISA] provides a variety of remedies to ensure that employees receive benefits they earned through employer-provided benefit plans.  Of relevance here, ERISA provides a private right of action for breach of a fiduciary duty.  Plan participants and beneficiaries may seek monetary relief from a plan fiduciary for failing to properly oversee a benefits plan.  The duty of prudence requires a plan fiduciary to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use…." [29 U.S.C.] §1104(a)(1)(B).  The duty of loyalty requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries." [29 U.S.C.] §1104(a)(1).
>
> In a defined contribution plan…, participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses.  Defined contribution plans often pay a variety of fees in exchange for services that third parties perform.  Investment-management fees, for example, compensate a fund, such as a mutual fund or index fund, for designing and maintaining the funds' investment portfolio.  Typically, investment-management fees are calculated as a percentage of the money a plan participant invests in a particular fund, which is known as an expense ratio.  Expense ratios tend to be higher for funds that are actively managed according to the funds' investment strategies, and lower for funds that passively track the makeup of a standardized index, such as the S&P 500.  Recordkeeping fees compensate recordkeepers who track the balances of individual accounts, provide regular account statements, and offer informational and accessibility services to participants.  Recordkeeping fees are assessed either as a flat fee per participant or via an expense ratio.

*Albert*, 47 F.4th at 575 (quotations and citations omitted).  The Court considers Ms. Probst's claims within this framework.

B.      **Breach of the Duty of Prudence Claim**

In support of its Motion to Dismiss, Lilly relies on *Albert*, in which it contends the Seventh

Circuit affirmed dismissal of "a nearly identical claim."  [Filing No. 35 at 13-14.][6]  Lilly argues

that Ms. Probst does not set forth allegations about the services provided to either the Plan or any

of the comparator plans listed in the Amended Complaint.  [Filing No. 35 at 14-15.]  It asserts that

Ms. Probst "makes a series of allegations about the types of services that recordkeepers typically

provide, without identifying the specific services that either [the Plan] or the comparator plans

actually received."  [Filing No. 35 at 15.]  Lilly notes that Ms. Probst lists standard services that

recordkeepers provide, but "does not allege which of the 13 comparator plans received which

services or how much of them."  [Filing No. 35 at 15.]  It argues that "generic lists of services are

insufficient to state a claim relating to recordkeeping services."  [Filing No. 35 at 15.]  Lilly

contends that, in any event, the service codes listed on the Form 5500s filed by the comparator

plans (which are publicly available) "show a highly variable number of service codes," and

contradict Ms. Probst's allegations that all recordkeepers of mega plans, including the Plan, provide

the same level and quality of services.  [Filing No. 35 at 16.]  Lilly argues further that judicially

noticeable documents show that the Plan paid substantially less than $77 per participant and the

comparator plans paid substantially more than $23-$39 per participant.  [Filing No. 35 at 17.]

Specifically, Lilly argues that Ms. Probst includes both the Fund Administration Fee and the Plan

Administration Fee in her $77 per participant figure, but Fund Administration Fees are not used to

pay the recordkeeper so should not be included when determining recordkeeping fees.  [Filing No.

35 at 17.]  Instead, Lilly contends, Fund Administration Fees are for expenses associated with the

operation of the investment funds, which are not included in the Amended Complaint's definition

---

[6] Indeed, counsel for Plaintiff Albert is counsel for Ms. Probst.

15

of "RKA," and which are not for services alleged to have been provided by Alight.  [Filing No. 35 at 17-18.]  Lilly argues further that while a portion of Plan Administration Fees is used to pay Alight, those fees are also used to pay other entities for services that are explicitly excluded from the Amended Complaint's definition of RKA, such as trustee fees, legal fees, and accounting fees. [Filing No. 35 at 18.]  Lilly asserts that the Plan's contracts with Alight, which it contends the Court may take judicial notice of, show the precise per-participant fees and reflect that those fees were $44 from 2016 to 2019, and then $33 effective January 1, 2020.  [Filing No. 35 at 19.]  Lilly also asserts that the RKA fees paid by the 13 comparator plans are understated because: the Form 5500s reflect direct compensation and indirect compensation; direct compensation includes fees other than recordkeeping; indirect compensation (which can be paid for recordkeeping and which Lilly argues Ms. Probst ignores in her calculations in any event) "usually consists of revenue sharing…based on the fees of the investment options, which are not shown on the Form 5500"; the compensation reported on the Form 5500 only includes amounts paid by the plan or its participants, and not fees paid by the employer; and Ms. Probst did not add in fees for services she alleges recordkeepers provide as part of their standard services, and which appear elsewhere on the Form 5500.  [Filing No. 35 at 20-23.]  Finally, Lilly argues that Ms. Probst's 13 comparator plans "represent a tiny fraction of so-called 'mega 401(k) plans'" – less than 1% of similarly-sized plans.  [Filing No. 35 at 25.]  It asserts that "[c]herry-picked comparisons like these do not allow an inference of imprudence." [Filing No. 35 at 25.]

In response,[7] Ms. Probst relies on *Coyer v. Univar Solutions USA Inc.*, 2022 WL 4534791 (N.D. Ill. Sept. 28, 2022), a case decided after *Albert*, and argues that she has sufficiently pled a claim for breach of the duty of prudence because she pled "facts to raise an inference of a deficient decision-making process for recordkeeping services by utilizing a sound basis for comparison – a meaningful benchmark, in the form of thirteen comparator funds." [Filing No. 41 at 20 (quotations omitted).]  She asserts that she does not need to provide examples of similar plans receiving the same services in the same year because she has also alleged "that the primary drivers of price in large plans are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant." [Filing No. 41 at 20-21.] Ms. Probst argues that the comparator plans were receiving at least the same services for less, so the fact that those plans paid less than Lilly is sufficient to support her breach of the duty of prudence claim.  [Filing No. 41 at 21.] She contends that she has set forth numerous allegations that were not present in the *Albert* case and that show the fees charged to the Plan for the services provided by Alight were excessive.  [Filing No. 41 at 10-13.] Ms. Probst argues that the Court should not consider the administrative service agreement documents between Alight and Lilly because they are outside of the pleadings and not subject to judicial notice, but that even if it does, "at most they only show the amounts paid to Alight, not to other service providers who also provided RKA to the Plan." [Filing No. 41 at 24.] Ms. Probst also takes issue with Lilly's argument that Fund Administration Fees and Plan Administration Fees are not coming out of Plan

---

[7] The Court notes Ms. Probst's (and to a lesser extent, Lilly's) practice of including lengthy footnotes which contain argument.  The use of lengthy footnotes could be construed as a party's attempt to circumvent the Court's page limits for briefs.  Moreover, lengthy footnotes are cumbersome and difficult for the Court to review.  For future reference, the Court directs all counsel to page 4 of the Court's revised Practices and Procedures, available on the Court's website, which provides as follows: "The Court does not deem information contained in footnotes as argument.  Accordingly, counsel should include all argument in the body of the brief."

participants' accounts to pay for recordkeeping and related administrative services, arguing that "[t]he exact amount of RKA fees cannot be known until discovery." [Filing No. 41 at 24-27.] She contends that to the extent Lilly disputes the numbers she has provided in her Amended Complaint, there is a factual dispute that is not ripe for resolution on a motion to dismiss. [Filing No. 41 at 28-29.]

In its reply, Lilly argues that the allegations Ms. Probst relies upon (and that she claims were not present in the *Albert* case) "contain nothing more than conclusory statements about 401(k) plans in general, and not a single fact about the services provided to any of the comparator plans," and "provide no basis for an inference that [the Plan] paid excessive fees." [Filing No. 44 at 3.] It asserts that "there is no way to know whether the services provided to each comparator plan are fairly comparable to those provided to [the Plan], and [Ms. Probst] cannot fill this hole by waving a conclusory wand and claiming that all plans receive exactly the same quantity and quality of services." [Filing No. 44 at 4.] Lilly notes that if the per participant price varied solely based on the size of the plan, then all of the comparator plans would pay the same fee since Ms. Probst contends they are similar in size, yet the fees reflected in the Comparator Table range from $23 to $39 per participant. [Filing No. 44 at 4-5.] Lilly argues that the Form 5500s for the comparator plans show that no plan lists the same service codes as the Plan. [Filing No. 44 at 5.] It asserts that *Coyer* was wrongly decided, and is a minority view and an outlier. [Filing No. 44 at 5-8.] Lilly also contends that Ms. Probst's other arguments about the RKA fees undermine her claims because: (1) she argues that it does not matter that Fund Administration Fees and Plan Administration Fees are paid to other service providers because they are still paid by Plan participants, but her Amended Complaint only challenges fees paid to Alight; and (2) she does not respond to Lilly's argument that she has not shown that the 13 comparator plans pay fees that are

representative of what a prudent fiduciary would pay for RKA services, rather than just the lowest fees she could find among the 1,600 mega 401(k) plans that exist. [Filing No. 44 at 8-11.]

ERISA requires plan fiduciaries to "act prudently when managing an employee benefit plan," *Albert*, 47 F.4th at 578 (citing 29 U.S.C. §1104(a)(1)(B)), but it does not "require fiduciaries…to act as personal investment advisers to plan participants," *White v. Marshall & Ilsley Corp.*, 714 F.3d 980, 994 (7th Cir. 2013), *abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014). In order to state a claim for breach of the duty of prudence under ERISA, a plaintiff must plead: "(1) that the defendant is a plan fiduciary; (2) that the defendant breached its fiduciary duty; and (3) that the breach resulted in harm to the plaintiff." *Allen v. GreatBanc Trust Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (quotation and citation omitted). Lilly's Motion to Dismiss focuses on the second element.

The Court looks to *Albert* in determining whether Ms. Probst has sufficiently alleged a breach of the duty of prudence claim. There, the plaintiff alleged – as Ms. Probst does – that his former employer paid excessive recordkeeping fees by failing to regularly solicit competitive bids, and he provided data for nine other plans which paid lower fees and which he contended had a similar number of participants and a similar amount of total assets. *Albert*, 47 F.4th at 579. The plaintiff alleged that the comparator plans paid between $32 to $45 per participant for an average of $40 per participant, and that his former employer paid $87 per participant and so breached the duty of prudence. *Id.*

In *Albert*, he Seventh Circuit noted that in *Divane v. Northwestern University*, 953 F.3d 980, 990-91 (7th Cir. 2020), it had previously "rejected the notion that a failure to regularly solicit quotes or competitive bids from service providers breaches the duty of prudence," and found that the Supreme Court's decision in *Hughes v. Northwestern University*, --- U.S. ----, 142 S. Ct. 737

19

(2022), did not affect that holding.  *Albert*, 47 F.4th at 579.  Specifically, the Seventh Circuit found

that the Supreme Court's decision in *Hughes* did not "have any bearing on the analysis of

[recordkeeping fees] claims," and pointed to a recent Sixth Circuit case holding that an ERISA

plaintiff had not stated a breach of the duty of prudence claim where the complaint did not allege

that the recordkeeping fees were excessive relative to the services rendered.  *Id.* at 580 (citing

*Smith v. CommonSpirit Health*, 37 F.4th 1160, 169 (6th Cir. 2022)).  In dismissing the plaintiff's

breach of the duty of prudence claim related to recordkeeping fees, however, the Seventh Circuit

noted that "recordkeeping claims in a future case could survive the 'context-sensitive scrutiny of a

complaint's allegations' courts perform on a motion to dismiss," but that plaintiff's complaint

"simply does not provide 'the kind of context that could move this claim from possibility to

plausibility' under *Twombly* and *Iqbal*."  *Albert*, 47 F.4th at 580 (quoting *Dudenhoeffer*, 573 U.S.

at 425, and *Smith*, 37 F.4th at 1169).

At the outset, the Court rejects the notion that Ms. Probst's allegation that Lilly did not

conduct competitive bidding on a regular basis is sufficient to state a claim for breach of the duty

of prudence.  The Seventh Circuit has instructed that there is no such requirement under ERISA.

*See Albert*, 47 F.4th at 579 (noting that the Supreme Court in *Hughes* "did not hold that fiduciaries

are required to regularly solicit bids from service providers"); *Divane*, 953 F.3d at 990-91, *vacated

on other grounds by Hughes*, 142 S. Ct. 737 (ERISA defendant "was not required to search for a

recordkeeper willing to take $35 per year per participant as plaintiffs would have liked").

Ms. Probst then relies on thirteen allegations in her Amended Complaint – which was filed

after the *Albert* decision – which she contends were not present in *Albert* and so distinguish her

Amended Complaint from the *Albert* complaint.  They include the following:

- "[A]ny minor variations in the level and quality of Bundled RKA services…had
  little to no material impact on the fees charged by Alight";

- "All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services";

- "While there may be minor differences in the way the Bundled RKA services are delivered, those differences are deemed immaterial to the price comparisons in virtually all cases";

- "Whether the minor differences be in the number of staff utilized for call center support, the frequency of participant communications, or the number of investment education sessions held by the plan sponsor, these differences are immaterial when considering the level and quality of services provided by the plan from a cost perspective";

- "[The Plan] had a standard package of Bundled RKA services from Alight, which provided Bundled RKA services of a nearly identical level and quality to other recordkeepers who service mega plans";

- "There is nothing in their Form 5500 filings…, nor anything disclosed in the participant section 404(a)(5) fee and service disclosure documents, that suggests that the annual plan administration fees charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans";

- "From the years 2016 through 2020…the [Comparator Table] illustrates the annual Bundled RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual Bundled RKA fees paid by the Plan";

- "[Ms. Probst] has participated in several 401(k) plans from other employers and there have been no material differences in the services that she has received";

- "Defendants disclosed to Plan participants through the Plan 404(a) fee disclosures that Plan participants would pay Bundled RKA through the 'Total Annual Operating Expense' of the investment options and that therefore the Plan participants would not see those fees directly";

- "These same Plan fee disclosures point out that the Total Annual Operating Expense covers not only investment management (portfolio management) fees, but also 'recordkeeping and participant service fees, trustee fees,…and other expenses related to the maintenance of the Plan or its funds'";

- "These services are standard RKA services.  The Plan fee disclosure goes on to define 'recordkeeping and participant services fees [as] Cost for activities like keeping data on participants and participant accounts, communication materials, internet services, and assisting participants with transactions.'  This describes all the standard bundled RKA services provided by all national recordkeepers to all large defined contribution plans";

- "The Plan fee disclosures also note that the 'Total Annual Operating Expenses [are] Fees that are charged as a percent of holdings in an investment to cover investment management fees plus any administrative fees such as recordkeeping, trustee, etc.'"; and

- "Finally, the Plan fee disclosure discloses that the total annual operating expense of the investment options includes 'an estimated fund administration fee from the investment manager…and an estimated Plan administration fee."

[Filing No. 41 at 10-13] (emphasis omitted).]

Ms. Probst's reliance on these allegations is unavailing for several reasons.  First, *Albert* requires that a plaintiff set forth allegations showing that the recordkeeping fees were "'excessive relative to the services rendered,'" *Albert*, 47 F.4th at 579 (quoting *Smith*, 37 F.4th at 1169), and Ms. Probst's attempt to satisfy that directive was to allege that all mega plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services.  These allegations are wholly conclusory and do nothing to identify what specific types of services comparator plans received relative to the Plan.  *See Singh v. Deloitte LLP*, 2023 WL 186679, at *5 (S.D. N.Y. Jan. 13, 2023) (allegation that "[n]early all recordkeepers in the marketplace offer the same range of services" did not provide requisite amount of specificity to support breach of the duty of prudence claim); *Laabs v. Faith Technologies, Inc.*, 2022 WL 17418358, at *3 (E.D. Wis. Nov. 9, 2022) (conclusory allegations that recordkeeping fees were excessive relative to the services rendered and that the defendant's plan "received a standard

package of [recordkeeping] services" did not state a claim for breach of the duty of prudence);[8]

*Mator v. Wesco Distribution, Inc.*, 2022 WL 3566108, at *4-5 (W.D. Pa. Aug. 18, 2022)

(allegations that other recordkeepers "provided identical or similar services of the same

quality…as those provided by [defendant's provider]" and that "[f]or large plans with greater than

5,000 participants, like the Plan, any minor variations in the way that these [recordkeeping]

services are delivered have no material impact on the fees charged by recordkeepers to deliver the

services" were insufficient to state a breach of the duty of prudence claim).

Second, Ms. Probst's allegations that any difference in services provided does not affect

the price of the services is not plausible.  Indeed, her own chart indicates that the 13 comparator

plans paid between $23 to $39 per participant, reflecting that there is some variation in price.

Additionally, the Amended Complaint states that the Comparator Table "illustrates the annual

Bundled RKA fees paid by other comparable plans of similar sizes with similar amounts of money

under management, receiving a similar level and quality of services, compared to the average

annual Bundled RKA fees paid by the Plan."  [Filing No. 26 at 21.]  But the Comparator Table

shows that the comparator plans are not all similar in size to the Plan, nor do they have similar

assets.  The Comparator Table reflects that the Plan has 25,817 participants and $6,583,650,795 in

assets, while three of the comparator plans have under 14,000 participants and another five have

under 20,000 participants.  [Filing No. 26 at 21-22.]  Further, six of the plans have under

$1,000,000,000 in assets and another five have under $4,000,000,000 in assets. [Filing No. 26 at

---

[8] The *Laabs* court noted "[i]t's conceivable that recordkeeping services are essentially fungible,
meaning that there aren't meaningful differences in services provided by various companies.  If
that's true, an allegation to that effect, supported by specific data, might suffice under *Albert*."
2022 WL 17418358, at *3 n.4.  Here, Ms. Probst alleges that there are not meaningful differences
in the recordkeeping services provided by companies, but her allegation is not "supported by
specific data." *Id.*

21-22.] These differences call into question Ms. Probst's characterization of the comparator plans as being of similar sizes with similar amounts of money under management.  Ms. Probst has put the Form 5500s at issue by relying on them to present comparator data, and clear inconsistencies make her allegations implausible.  *See Mator*, 2022 WL 3566108, at \*7-8 (dismissing breach of the duty of prudence claim based on similar comparator chart, and stating "the so-called comparators range from 4,950 participants to 13,502 participants and ranged from $218 million in assets to over $2 billion.  Such disparities raise serious doubt as to plausibility of how the purported comparator plans are indeed comparable.").

Third, even assuming Ms. Probst's allegations are not conclusory and are plausible, the information Ms. Probst relies upon to support those allegations contradicts her broad and sweeping statements.  Ms. Probst heavily relies on the Form 5500s of the 13 comparator plans, and even alleges that information in the forms "was equally or even more easily available to [Lilly] during the Class Period" in support of her assertion that Lilly should have known it was paying too much. [*See, e.g.*, Filing No. 26 at 22.]  Because she relies on the Form 5500s and provides information from them in her Amended Complaint, the Court finds it appropriate to consider them in ruling on the Motion to Dismiss.  *See Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (court may consider "documents that are critical to the complaint and referred to in it" in connection with a Rule 12(b)(6) motion to dismiss); *188 LLC v. Trinity Industries, Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (same principle).  Further, the Form 5500s are public records, of which the Court may take judicial notice.  *Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022); *Terraza v. Safeway Inc.*, 241 F.Supp.3d 1057, 1067 (N.D. Cal. 2017) (taking judicial notice of Form 5500s in considering motion to dismiss ERISA claims).  The Plan's Form 5500 reflects that Alight provided services corresponding with the following codes: 15 (recordkeeping and information

24

management (computing, tabulating, data processing, etc.)), 28 (investment management), 50

(direct payment from the plan), and 52 (investment management fees paid indirectly by plan).

[Filing No. 32-6 at 7 (Instructions for Form 5500, indicating what services correspond with each

code); Filing No. 32-7 at 6 (the Plan's Form 5500, listing services provided by Alight).]  None of

the Form 5500s for the 13 comparator plans reflect this combination of services provided by the

recordkeeper.[9]  The Court rejects Ms. Probst's arguments that any difference in services provided

is irrelevant because the comparator plans were "receiving at the least [the] same services as [the

Plan]," and that "there is no exact science as to how plan administrators determine what service

codes to use, and the Form 5500 instructions do not specify."  [Filing No. 41 at 23.]  In fact, only

one comparator plan – the Kindred 401(k) Plan – was receiving the same services as the Plan,

along with others.  [See Filing No. 32-17 at 7.]  Further, Ms. Probst's argument that the service

---

[9] [See Filing No. 32-8 at 6 (Sutter Health Retirement Income Plan's Form 5500 reflecting services for codes 60, 64, and 65 provided by Fidelity Investments Institutional ("Fidelity")); Filing No. 32-9 at 6 (Fortive Retirement Savings Plan's Form 5500 reflecting services for codes 37, 64, 65, and 71 provided by Fidelity); Filing No. 32-10 at 6 (Michelin Retirement Account Plan's Form 5500 reflecting services for codes 15, 16, 25, and 52 provided by The Vanguard Group, Inc. ("Vanguard")); Filing No. 32-11 at 6 (Dollar General Corp. 401(k) Savings & Retirement Plan's Form 5500 reflecting services for codes 37, 49, 64, and 99 provided by Voya Institutional Plan Services); Filing No. 32-12 at 5 (Michelin 401(k) Savings Plan's Form 5500 reflecting services for codes 15, 16, 25, 37, and 52 provided by Vanguard); Filing No. 32-13 at 6 (FedEx Office & Print Services, Inc. 401(k) Retirement Savings Plan's Form 5500 reflecting services for codes 15, 16, 21, 25, 26, 37, 50, 52, and 57 provided by Vanguard); Filing No. 32-14 at 6 (Pilgrim's Pride Retirement Savings Plan's Form 5500 reflecting services for code 64 provided by Great-West Life & Annuity Insurance ("Great-West")); Filing No. 32-15 at 6 (JBS 401(k) Savings Plan's Form 5500 reflecting services for code 64 provided by Great-West); Filing No. 32-16 at 6 (Sanofi U.S. Group Savings Plan's Form 5500 reflecting services for codes 15, 37, and 49 provided by T. Rowe Price); Filing No. 32-17 at 7 (Kindred 401(k) Plan's Form 5500 reflecting services for codes 15, 21, 25, 28, 38, 49, 50, 52, 57, 59, 62, 64, and 65 provided by T. Rowe Price); Filing No. 32-18 at 6 (The Savings and Investment Plan's Form 5500 reflecting services for codes 15, 16, 25, 37, 38, and 52 provided by Vanguard); Filing No. 32-19 at 7 (Deseret 401(k) Plan's Form 5500 reflecting services for code 64 provided by Great-West); Filing No. 32-20 at 6 (Danaher Corporation & Subsidiaries Savings Plan's Form 5500 reflecting services for codes 37, 64, 65, and 71 provided by Fidelity).]

codes are not an "exact science" undermines the validity of the Form 5500s as an effective tool for comparing RKA fees – yet the forms are the main source of Ms. Probst's allegation that the Plan was paying too much for those fees. *See Mator*, 2022 WL 3566108, at *8 (dismissing breach of duty of prudence claim based on fees paid by comparators where "an examination of the 2018 Form 5500 for at least one comparator…did not have the same list codes relative to services as [defendant's provider] did for the Plan").

And without wading too far into the weeds of the Form 5500s, it is obvious that relying on the Form 5500s as the source for the comparator plan information is problematic for numerous reasons. For example, the comparator plans received services other than recordkeeping, but all services are lumped into one sum so the total amount paid to the recordkeeper divided by the number of plan participants may not be an accurate representation of what the comparator plan paid for recordkeeping. [*See, e.g.*, Filing No. 32-12 at 5 (Michelin 401(k) Savings Plan's Form 5500 reflecting that Vanguard provided services other than recordkeeping, including trustee services (code 25), but lump fee of $570,186 is used in the Comparator Table).] This is borne out by the figures for the Plan reflected in the Comparator Table, which represent that the Plan had an average of 25,817 Plan participants and paid Alight an average of $1,989,295 during the Class Period, or $77 per participant. [Filing No. 26 at 22.] But the Administrative Services Agreements between Lilly and Alight show that the Plan paid $46 per participant from 2010 to January 2014, then $44 per participant until the end of 2019, then $33 per participant effective January 1, 2020. [Filing No. 33-1 at 4; Filing No. 33-2 at 5; Filing No. 33-3 at 4.] Ms. Probst argues that even if the Court considers the amounts listed in the Administrative Services Agreements, "at most they only show the amounts paid to Alight, not to other service providers who also provided RKA to the Plan." [Filing No. 41 at 24.] But this litigation is about the fees paid to Alight, and not to other

providers.  Ms. Probst cannot rely on the total amounts she alleges the Plan paid for RKA services to all providers when her claims are focused solely on what the Plan paid to Alight.

Finally, the Court addresses the *Coyer* decision, upon which Ms. Probst heavily relies.  The *Coyer* court found that allegations similar to the ones set forth by Ms. Probst stated a claim for breach of the duty of prudence, finding that the plaintiffs "[did] not need to provide examples of similar plans receiving the same services in the same year where, according to plaintiffs, the primary drivers of price in large plans are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant." *Coyer*, 2022 WL 4534791, at *5 (emphasis omitted).  The *Coyer* court relied on the plaintiffs' allegation that each of the comparator plans "were receiving at least the same services for less." *Id.* (emphasis omitted).  First and foremost, this Court is not bound by the *Coyer* decision.  Further, it disagrees that the allegations in this case – which it acknowledges are similar to those in *Coyer* – satisfy the Seventh Circuit's directive in *Albert* that a plaintiff must plead specific facts showing that the recordkeeping fees were "'excessive relative to the services rendered.'"  *Albert*, 47 F.4th at 580 (quoting *Smith*, 37 F.4th at 1169).  Instead, as discussed above, Ms. Probst's allegations are conclusory and do not state a plausible claim for breach of the duty of prudence.

For all of these reasons, the Court **GRANTS** Lilly's Motion to Dismiss Ms. Probst's breach of the duty of prudence claim.  [Filing No. 31.]

### C.    Prohibited Transactions/Breach of the Duty of Loyalty Claim

In support of its Motion to Dismiss, Lilly argues that the only allegation supporting Ms. Probst's prohibited transactions/breach of the duty of loyalty claim is "a single sentence where [she] declares that the services from Lilly employees were 'standard 'plan administration' services that were provided already by [Alight],' [and that] [b]ecause the services were allegedly

duplicative,…they 'did not provide any value' and should not have been reimbursed." [Filing No. 35 at 27 (quoting Filing No. 26 at 29-30).] Lilly contends that there is no factual support for Ms. Probst's contention, and that she lists the services recordkeepers typically provide but does not allege that Lilly provided any of those services and does not allege what services Lilly's employees actually did provide. [Filing No. 35 at 28.] Lilly notes that Ms. Probst relies on the Plan's Form 5500, which lists Lilly-provided services as code 14 and reflects that Alight did not provide services under code 14, so the Form 5500 does not show "overlap between the Lilly-provided services and Alight's services." [Filing No. 35 at 28.] Lilly notes that the Form 5500 has a separate service code for "Plan Administrator" services, and argues that the Plan administrator is usually the Plan sponsor and that it would always violate the duty of loyalty for a plan to seek reimbursement under the "Plan Administrator" code according to Ms. Probst's theory. [Filing No. 35 at 28.] Lilly also contends that ERISA provides that plans should try to defray reasonable expenses of administering the plan, and "[n]owhere in the statue does it suggest that a fiduciary cannot be reimbursed for its reasonable expenses." [Filing No. 35 at 29.] Finally, it notes that Department of Labor regulations recognize that if a fiduciary reimburses itself for "direct expenses properly and actually incurred in the performance of such services," it does not violate ERISA. [Filing No. 35 at 29.]

In response, Ms. Probst argues that her allegations that Alight is the contract administrator and provided administrator services and Lilly paid itself $2 million dollars during the Class Period for providing plan administration services are enough to state a claim for prohibited transactions/breach of the duty of loyalty. [Filing No. 41 at 30.] She contends that her "expert will establish [that] almost no mega plans" do this. [Filing No. 41 at 30.] Ms. Probst notes that the Form 5500 defines "plan administrator" as "[t]he person or group of persons specified as the

administrator by the instrument under which the plan is operated," both Alight and Lilly provided "administrative services" for the Plan, and "there is overlap between the Lilly-provided services and Alight's services." [Filing No. 41 at 30-31.] She argues that it is "impossible to know without discovery" whether Lilly paid itself for administrative services already provided by Alight and that she need not allege "specifics of the nature of plan administrator services performed by Lilly employees," but only facts from which a factfinder could infer that self-dealing occurred. [Filing No. 41 at 31.] Ms. Probst argues further that Department of Labor regulations relied upon by Lilly do not apply because she is alleging that Lilly used its authority as a fiduciary to unlawfully enrich itself, which is not permitted by the regulations, and that Department of Labor Advisory Opinions relied upon by Lilly are distinguishable. [Filing No. 41 at 31-33.] Ms. Probst contends that any omission of an allegation regarding whether compensation to Lilly was reasonable is not a basis for dismissing her claim, and "[i]t is simply too early to determine whether [Lilly] paying itself at least $2 million in plan assets during the Class Period is reasonable compensation as far as defraying reasonable expenses of administering the plan." [Filing No. 41 at 33 (quotation and citation omitted).]

In its reply, Lilly argues that Ms. Probst has only set forth general allegations regarding the types of services that recordkeepers typically provide, and no specific allegations regarding the services that Lilly employees provided. [Filing No. 44 at 12.] It contends that the Form 5500 instructions and definitions do not support Ms. Probst's theory that Alight's and Lilly's plan administration services overlapped, pointing to the Form 5500's statement that "contract administrator" services "[d]o not include salaried staff or employees of the plan," which "makes clear that costs associated with services provided by Lilly employees and costs associated with contract administrator services are distinct, not overlapping." [Filing No. 44 at 12.] Lilly argues

that Ms. Probst's contention that it is impossible to know without discovery whether her theory is valid "turns the litigation process on its head," that she is not "entitled to guess at the facts in the hope that discovery might later prove them true," and that she cannot rely on what she thinks her expert will testify to.  [Filing No. 44 at 13.]  Finally, Lilly asserts that Ms. Probst's arguments regarding the reasonableness of the fee paid to Lilly are irrelevant, as she claims that it was unlawful for Lilly to reimburse itself at all, not that the amount reimbursed was unreasonable. [Filing No. 44 at 14.]

Under ERISA, plan fiduciaries are required to "discharge [their] duties…solely in the interest of the participants and beneficiaries," and certain transactions between the plan and fiduciaries are prohibited as self-dealing.  29 U.S.C. §§ 1104-1106.  Ms. Probst asserts claims under both § 1104(a)(1)(A) and § 1106(b)(1).  [Filing No. 26 at 37-38.]  She relies on Lilly's Form 5500s from during the Class Period and sets forth three allegations in support of her prohibited transactions/breach of the duty of loyalty claim: (1) that Lilly paid itself over $2,000,000 for providing "plan administration" services to the Plan under service code 14; (2) that the plan administration services provided to the Plan by Lilly "did not provide any value to the Plan and did not warrant the payment of the fees to itself"; and (3) that the plan administration services provided to the Plan by Lilly "are standard 'plan administration' services that were provided already by…Alight."  [Filing No. 26 at 29-30.]

For her claim under §1104(a)(1)(A), Ms. Probst does not allege what types of services Lilly employees provided to the Plan, so she has not plausibly alleged that they were duplicative of the services provided by Alight or that they did not provide any value to the Plan.  *See Guyes v. Nestle USA, Inc.*, 2022 WL 18106384, at *7 (E.D. Wis. Nov. 21, 2022) (conclusory allegations that defendant's plan made payments to defendant for commissions and fees was too speculative and

did not allege why defendant received the payments, so there was no basis to allege "that the services didn't provide any value to the Plan, weren't provided for the exclusive benefit of the participants, and didn't warrant the payment of the fees to [defendant].")  Additionally, Ms. Probst relies upon the Form 5500s, but they indicate that Alight did not provide any services under service code 14 – the code corresponding with the services that Ms. Probst claims were duplicative.  [*See* Filing No. 32-7 at 6 (reflecting that Alight performed services only under codes 15, 28, 50, and 52).]

As far as her claim under §1106(b)(1), Lilly's Form 5500 indicates that payments to Lilly under service code 14 were to Lilly as the "Plan Sponsor."  [Filing No. 32-7 at 6.]  Section 1106(b)(1) prohibits a fiduciary from "deal[ing] with the assets of the plan in his own interest or for his own account."  29 U.S.C. § 1106(b)(1).  It does not prohibit a plan from paying a plan sponsor for services the plan sponsor provided.  *See Danza v. Fid. Mgmt. Tr. Co.*, 533 Fed. App'x 120, 126 (3d Cir. 2013) ("[Section 1106's] purpose is to prohibit transactions that might involve self-dealing by a fiduciary, not to prevent fiduciaries from being paid for their work.").  Ms. Probst has not stated a claim under § 1106(b)(1).

Finally, the Court is disturbed by Ms. Probst's statement that "it is impossible to know without discovery" whether Lilly paid itself for administrative services already provided by Alight.  [Filing No. 41 at 31.]  This statement shows that Ms. Probst's allegations are based on speculation and because they do not "raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 545, they do not state a viable claim for prohibited transactions/breach of the duty of loyalty.

The Court **GRANTS** Lilly's Motion to Dismiss Ms. Probst's prohibited transactions/breach of the duty of loyalty claim.  [Filing No. 31.]

31

### D.      Failure to Adequately Monitor Other Fiduciaries Claim

Lilly argues in support of its Motion to Dismiss that Ms. Probst's failure to adequately monitor claim is "fully dependent on the validity of [her] breach of fiduciary duty claims and should be dismissed because [Ms. Probst] has failed to plausibly allege an underlying breach." [Filing No. 35 at 26-27 (quotation omitted).]  It asserts that in any event, Ms. Probst merely alleges that the Plan's allegedly excessive fees "inferentially establish that [Lilly] breached [its] duty to monitor," which is simply a legal conclusion.  [Filing No. 35 at 27 (quotation omitted).]

In her response, Ms. Probst argues that she has stated claims for breach of the duty of prudence, as well as for prohibited transactions/breach of the duty of loyalty, so has also stated a claim for failure to monitor.  [Filing No. 41 at 34.]

In its reply, Lilly contends that Ms. Probst agrees that the duty to monitor claim "rises and falls with the underlying breach of fiduciary duty claim at this stage in the proceedings."  [Filing No. 44 at 15.]

Because the Court has found that Ms. Probst has not stated claims for breach of the duty of prudence or prohibited transactions/breach of the duty of loyalty, her failure to monitor claim also fails.  *See Albert*, 47 F.4th at 583 (dismissing duty to monitor claim because it "rise[s] or fall[s] with [the] duty of prudence and duty of loyalty claims"); *Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010) ("Several [district] courts have held that a failure to monitor claim is derivative in nature and must be premised [on] an underlying breach of fiduciary duty."). Accordingly, the Court **GRANTS** Lilly's Motion to Dismiss Ms. Probst's failure to monitor claim. [Filing No. 31.]

**IV.**

**CONCLUSION**

Based on the foregoing, the Court **GRANTS** Lilly's Motion to Dismiss, [31], **DISMISSES** Ms. Probst's claims **WITH PREJUDICE**,[10] **DISMISSES** Ms. Probst's putative class claims **WITHOUT PREJUDICE**,[11] and **DENIES** the parties' Joint Motion for Oral Argument, [38]. Final judgment shall enter accordingly.

Date: 2/3/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF to all counsel of record**

---

[10] Pursuant to Federal Rule of Civil Procedure 15(a)(1)(B), a plaintiff may amend her complaint once as a matter of course in response to a motion to dismiss. *Brown v. Bowman*, 2011 WL 1296274, at *16 (N.D. Ind. 2011). The 2009 notes to that rule emphasize that this amendment "will force the pleader to consider carefully and promptly the wisdom of amending to meet the arguments in the motion." Here, Ms. Probst has already amended her complaint in response to an earlier motion to dismiss, [*see* Filing No. 11 (Lilly's first Motion to Dismiss); Filing No. 26 (Amended Complaint)]. The Court is not required to give Ms. Probst another chance to plead her claims and, in its discretion, dismisses those claims with prejudice.

[11] Because Ms. Probst does not have viable individual claims, she is not an adequate class representative. *Chavez v. Ill. State Police*, 251 F.3d 612, 630 (7th Cir. 2001) ("[I]f the court determines that the named plaintiffs' claims lack merit, such a decision 'ordinarily, though not invariably,…disqualifies the named plaintiffs as proper class representatives,' thus resolving the issue of class certification.") (quoting *Cowen v. Bank United of Texas, FSB*, 70 F.3d 937, 941 (7th Cir. 1995)). Dismissal of the class claims without prejudice is appropriate. *See, e.g.*, *Corrigan v. Domestic Linen Supply Co., Inc.*, 2012 WL 2977262, at *5 (N.D. Ill. July 20, 2012) (where named plaintiffs were required to arbitrate their claims and so could not represent a class, class claims were dismissed without prejudice).